# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
April 25, 2012 Session

## STATE OF TENNESSEE v. THOMAS D. TAYLOR (a/k/a JAMES RAY MCCLINTON)

**Direct Appeal from the Criminal Court for Bradley County**
**No. 09-274, No. 11-CR-230     Amy A. Reedy**

_____

**No. E2011-00500-CCA-R3-CD - Filed December 21, 2012**
**No. E2011-02114-CCA-R3-PC**

_____

This case is the consolidation of appeals by the Defendant, Thomas D. Taylor (a/k/a James Ray McClinton), of two cases, a direct appeal and the appeal from a the denial of a petition for a writ of error coram nobis. A Bradley County jury convicted the Defendant of especially aggravated kidnapping, a Class A felony, and aggravated assault, a Class C felony. The trial court imposed a sentence of sixty years, at 100%, for the especially aggravated kidnapping conviction and ten years, at 35%, for the aggravated assault conviction. The trial court ordered these sentences to run consecutively for a total effective sentence of seventy years. In his direct appeal, the Defendant contends the following: (1) for numerous reasons, he was denied his right to the effective assistance of counsel; (2) the trial court erred when it limited cross-examination of the victim; (3) prosecutors engaged in misconduct; and (4) the trial court erred in failing to consider new evidence presented during the motion for new trial. In the appeal from the trial court's denial of his petition for writ of error coram nobis, the Defendant contends that the trial court erred when it denied his petition because the victim's medical records contained newly discovered evidence. After consolidating the appeals and thoroughly reviewing the record and applicable authorities, in the Defendant's direct appeal, we affirm the judgments of the trial court. In the Defendant's appeal from his petition for a writ of error coram nobis, we affirm the judgment of the coram nobis court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Brent Horst, Nashville, Tennessee for the appellant, Thomas D. Taylor (a/k/a "James Ray McClinton").

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Steven Bebb, District Attorney General; Cynthia A. LeCroy-Schemel and Joseph Y. McCoin, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts and Procedural History**

**A. Jury Trial**

This case arises from the Defendant's involvement in the kidnapping and assault of the victim, Tami Lynn Pierce. A Bradley County grand jury indicted the Defendant for especially aggravated kidnapping, aggravated assault, and for being a felon in the possession of a firearm. The parties presented the following evidence at trial: The victim testified that, on Easter 2009, she sat on a bench between a Family Dollar Store and a Rent-A-Center, and she needed a ride home because she has "a disability with [her] legs and [] can't walk." She said that she saw the Defendant "pull[] up on his motorcycle" and go into a Burger King across the street from Family Dollar. She stated that the Defendant then "pulled up beside" her and asked if anything was wrong. She replied that she was "just looking for a ride to get to [her] house." The Defendant offered the victim a ride home, and she accepted.

As the Defendant drove down the road, he took a ramp to enter the interstate. The victim, however, leaned up to him and told him that she "did not want to go on the freeway" because she was "not familiar with this town" and only knew one way to her house. She testified that the Defendant then reached into a black leather case attached to the outside of his belt and removed a knife. He then turned around, put the knife to the victim's throat, and told her to be quiet. The victim stated that she could not get off the motorcycle because they were going too fast.

The victim stated that the Defendant took her to his trailer home, where she assumed the Defendant lived by himself. She said that the Defendant forced her into the back bedroom, made her lie face down on the bed, and put her hands behind her back. The Defendant then handcuffed her, held a gun to her head, and told her that he would kill her if she screamed. She said that the Defendant placed shackles around her legs, "stripped" off her clothes, and connected the handcuffs to the shackles so as to place the victim in a fetal position. The victim testified that she saw the Defendant take a gun out of a "white Styrofoam box" that was on the bed. The Defendant then said, "the next morning he was going to give [the victim] a shower and that he was going to rape [the victim] anally and vaginal[ly]."

2

The victim testified that, at one point, the Defendant took her into a room that had a computer. He handcuffed her to a chair, and he began to masturbate, but he "couldn't get it up." The Defendant became upset and said that he was a "foolish man" because "a man is foolish without a woman." The victim stated that, throughout their interactions, the Defendant kept calling her "Debbie." The victim testified that the Defendant then took photographs of her, in several different positions, while she had on the handcuffs and shackles. The victim stated that she spent the rest of the night with the Defendant in bed, handcuffed and shackled.

In the morning, the Defendant removed the shackles from the victim's feet. When the Defendant went into the kitchen to make something to eat, the victim got off the bed, looked down the hallway, and tried to open a back door. The door would not open, so she ran back to the bedroom and sat down. She looked down the hallway again to make sure the Defendant was still in the kitchen, ran back to the door, that time opened it, and ran outside to a neighbor's house. The victim testified that she ran through some woods, naked and handcuffed, until she found a house. She realized that the Defendant was chasing after her, so she banged on the door, screaming for the homeowner to open the door. The homeowner let her inside, and the victim called 911. The Defendant pounded on the door, but he left after he saw the victim on the phone.

On cross-examination, the victim acknowledged that she lived with her boyfriend, who had been violent with her in the past. She agreed that, after the kidnapping by the Defendant, she sought two charges against her boyfriend for domestic assault. She admitted that her boyfriend was convicted on both of those charges. She also stated that, while she sat on a bench across from the Burger King, her boyfriend was across "the parking lot," talking to a friend. She also acknowledged that her boyfriend saw her leaving with the Defendant. The victim also stated that, when the Defendant threatened her with the knife, he held it against her neck with his left hand and drove the motorcycle with his right hand. The victim did not know the exact time that she ran down the road naked from the Defendant's trailer home. The only thing that she knew was that "it was light out."

Maggie Dale testified that, on Easter Sunday 2009, the victim knocked on the door of her trailer home, crying and screaming. Dale said that she opened the door and the victim entered, immediately looked for a phone, and called the police. The victim was naked and she had on handcuffs. Dale testified that, right after she let the victim into her trailer home, a man knocked on the door. Dale said that she "didn't go to the door or see who it was or nothing," but she "took it to be a man." Dale stated that the man did not attempt to enter the house and that she did not have the door locked. Dale testified that the incident occurred in the middle of the day. She stated that she spoke to the 911 operator.

3

Shane McKee, a deputy with the Bradley County Sheriff's office, testified that he responded to Dale's residence on a call that the victim was undressed and in need of help. He stated that, when he arrived, he found the victim "fully undressed" and "very upset." He said that she was crying and had on a pair of handcuffs. The deputy determined from which residence the victim fled, and he remained in front of that residence until a search warrant was obtained. Once the search warrant was obtained, Deputy McKee and other detectives and deputies kicked in the front door of the Defendant's residence, but the Defendant was not there.

Joseph Jewell Lea, a special agent with the United States Secret Service, testified that, in April 2009, he was employed with the Bradley County Sheriff's office as a detective. Agent Lea stated that he came into contact with the victim when he responded to the scene. He testified that the victim was "extremely upset" and that she had "redness" around her wrists where handcuffs had been removed. Agent Lea also noticed that the victim had "red scratches" on her feet and ankles "from what appeared to be running down the roadway barefoot and across the grass and across the roadway and also from the possibility of having the leg shackles on her." He interviewed neighbors and obtained a description of the Defendant and his motorcycle. Other officers secured the area, and Agent Lea stated that the Defendant was not at his residence.

Agent Lea testified that he assisted in executing the search warrant of the Defendant's trailer home. During the search, he found a white clothes basket in a back bedroom that contained "male gender clothing" and items that the victim described, including a bra, jeans, black shoes, and a shirt. The agent also found a revolver, which matched the victim's description of the revolver that her assailant had used to threaten her. In that bedroom, the agent also found additional handcuffs and a bag that contained shackles and "a BDSM mask that contain[ed] a gag," which Agent Lea described as "a black leather mask that conceals and covers and straps over the whole head and has a ball within it that would not enable someone to speak." Further, Agent Lea testified that he found "several identifications" inside the Defendant's trailer home, which indicated "three possible names" for the Defendant. Those identifications included a South Carolina driver license under the name "James Ray McClinton," a Tennessee driver's license and social security card under the name "John Robert Corner, Jr.," a Pennsylvania driver's license under the name "James Ray McClinton," and two Tennessee driver licenses under the name "Thomas Taylor." Agent Lea testified that the photographs on the different identifications "depict someone that resembles the [D]efendant." Agent Lea also stated that he found a bowl containing ravioli that had been placed on the corner of a washer or dryer, which was "right at the back door."

On cross-examination, Agent Lea admitted that neither a knife with an orange handle nor a black pouch were recovered during the search. Agent Lea stated that, after questioning

4

the victim for a period of time, she remained consistent with her initial description of the events.

The Defendant presented James Julian Beck, who testified that he had been neighbors with the Defendant for seven or eight years. He stated that, on Easter Sunday 2009, he saw the Defendant drive up to his trailer home on his motorcycle with a woman. Beck stated that the Defendant saw him and "throwed" his hand up at him. Beck testified that he did not see the Defendant force the victim to go into the trailer home.

On cross-examination, Beck acknowledged that he did not know the Defendant by any name other than "John Thomas." Beck stated that he did not talk to the Defendant "a whole lot" because the Defendant was a truck driver.

The Defendant testified that, at the time of these events, he was unemployed and was looking for work. He stated that, on Easter Sunday 2009, he went out for a ride on his motorcycle. He decided to stop at a Burger King to use the bathroom. When he left the Burger King, the alleged victim walked toward him, and the Defendant thought he recognized her as one of his former girlfriends. The Defendant testified that she told him that her boyfriend had kicked her out and that she had no place to stay for the night. The Defendant asked the victim whether she was a prostitute, to which she replied no. The Defendant said that, on the way to his trailer home, they passed "quite a few" police cars. The Defendant testified that, once they arrived at the trailer home, he and the victim engaged in consensual sex. He stated that he had a bag of "sex toys, handcuffs, and a mask." After the Defendant and the victim engaged in consensual sex, the victim asked the Defendant to pay her. The victim said that she needed to be paid to "give the money to [her] boyfriend." The Defendant refused to pay her because he had asked her earlier if she was a prostitute, and she had said no. The Defendant testified that he offered to take the victim back to Chattanooga, to a homeless shelter, or a shelter for battered women. She refused, so he offered for her to stay the night, under the condition that she allow him to take her to Chattanooga the next morning.

The Defendant said that, the next morning, he woke up, showered, and applied for jobs on the internet through a career center in Chattanooga. He said that he also called the Tennessee Trader to place ads for the following items: a 427 Tom Deck engine block, an IBM computer, a 1968 Chevy truck, and a roommate. While the victim slept, the Defendant cleaned his kitchen and made some food. He said that, when the victim awoke, they again engaged in consensual sex. She then told the Defendant that she was hungry, and he offered to heat up some beef ravioli for her. He said that he walked down the hall to bring it to her, but, as he walked toward her, she came out of the bedroom with her hands behind her, kicked him in the crotch, opened the door, pushed him out, jumped down on him, and ran away from

5

the trailer home. He said that he "barely put the bowl . . . on the washing machine" before she pushed him out the door. The Defendant said that he ran after her, but he did not see the handcuffs on her. He said that he "was scared" and decided to leave in his truck.

The Defendant testified that he could not have driven his motorcycle for "any length of time" with one arm or hand, as the victim had testified, because he has an injured joint on one arm and a left shoulder injury. The Defendant further stated that the house that the victim ran to from his trailer home was not next door, but it was "between an eight[h] and a quarter of a mile away."

On cross-examination, the Defendant admitted that, after he left his trailer home, he went to the Cascade Motel in Chattanooga. He did not rent the room under his name, but stated that a "friend's daughter" rented the motel room in her name for the Defendant. The Defendant admitted that he was headed to Pennsylvania. The Defendant continually denied that the victim wore the handcuffs when she ran out of his trailer home. He also testified that he was not an expert on handcuffs, shackles, and masks, but he was not "totally ignorant" of them. The Defendant did not deny handcuffing another woman, a former girlfriend, while he was "partying" with her in his bedroom.

Mary Lou Blair, owner of the Tennessee Trader, identified a copy of the Tennessee Trader with "a certain telephone number in it" that belonged to the Defendant. She testified that the Tennessee Trader does not list the names of the people that place ads; it only lists telephone numbers.

On cross-examination, Blair stated that she did not know when the call was placed by the Defendant for the ad in the Tennessee Trader. She testified that she "[o]nly [knew] that it was placed within a week before the issue came out," which was the week the events in this case took place.

Based on this evidence, the jury found the Defendant guilty of especially aggravated kidnapping and aggravated assault. The trial court sentenced the Defendant to sixty years at 100% for the especially aggravated kidnapping conviction and ten years at 35% for the aggravated assault conviction, to be served consecutively.

## B. Motion for New Trial Hearing

The Defendant's trial counsel ("Counsel") testified that he did not "have any memory" of the State providing him information about the victim's prior felony conviction. He, however, recalled finding "something" in his file about it. Counsel stated that he "examined" the information he had and did not find the information to be "useful." Counsel agreed that

6

he was "under the impression it was a misdemeanor conviction." Counsel further testified that the victim's aggravated battery felony conviction was not a conviction he considered "particularly impeaching." Counsel considered impeaching a witness with prior felony convictions as "overplayed." He stated that he would have considered using the felony "if it had something to do with integrity." He testified that, although "[t]he rule allows you to do it . . . , I have never really thought that it was all that useful . . . ."

Counsel testified that the case did not hinge on credibility; instead, he stated that "the egregious facts . . . overplayed" all credibility issues. He testified that the fact that "a woman [ran] butt naked out of his trailer, handcuffed, screaming up to the neighbor . . . speaks volumes." He further testified that he did not find the victim's felony conviction of aggravated battery "all that damning" and "would not consider that particularly impeaching." He stated that he did not believe the conviction went to the victim's integrity, so he did not use it to impeach the victim.

Regarding the victim's prior conviction for prostitution, Counsel testified that he remembered a pretrial conference on the conviction. Counsel did not "think it was admissible under the rules" because it was a misdemeanor, so he decided not to pursue it at trial. Counsel stated that he did not need to use the prostitution conviction as part of the defense theory because the circumstantial evidence in the case "ha[d] prostitution written all over it."

Regarding testimony about various identifications found in the Defendant's trailer home, Counsel testified that he did not object because the Defendant "was indicted under both names." Counsel stated that he "knew that [the Defendant] had documents with his other name on it." Counsel testified that there was no dispute to the fact that the identifications all identified the Defendant as the physical person, "[s]o identification was not really an issue."

When asked about the State questioning the Defendant about handcuffing another woman in a manner similar to that in this case, Counsel responded that he did not recall that line of questioning.

Addressing the various statements made by the State at voir dire, opening statements, and closing arguments, Counsel testified that nothing the State said throughout the trial amounted to prosecutorial misconduct. Counsel did not think that anything the State said was "an expression of a personal opinion." Rather, Counsel stated that it "is an attorney's job . . . to take a set of fact[s] and put a label on them, to tweak it a certain way or put a spin on it and force the facts and put a label on it." Further, Counsel testified that he thought it was "appropriate" for the State to refer to the Defendant as "a sociopathic predator." As a

7

result, Counsel did not see any reason to object.

On cross-examination, Counsel agreed that the evidence was "overwhelming" and proved to be a "huge hurdle" to overcome. In addition to the fact that the victim ran naked down the road to a neighbor's house, the Defendant fled to a motel in Chattanooga, which further complicated the case. Counsel agreed that he obtained discovery on this case and that he had the information from the preliminary hearing, so he was aware of the proof when he accepted the case. Counsel stated that the Defendant testified, through which he presented the theory of defense that the victim was a prostitute and mentioned the victim's relationship with her boyfriend, whom he alleged was a pimp. Counsel testified that he tried to retrieve certified copies of the victim's boyfriend, Edward Nard's, criminal record. Counsel stated that he questioned the victim during the trial about her boyfriend and her relationship with him. Counsel cited the Defendant's claim in his motion for new trial that Counsel did not "flush out" the victim's role as a prostitute, stating that "all [the victim] ever said in pre-trial discovery was this was her boyfriend . . . having a boyfriend does not make you a prostitute." Counsel further reiterated that the victim's other actions, specifically going up to the Defendant, getting on his motorcycle, and "going to first base with him . . . had prostitute written all over it." Counsel stated that he did not think the prostitution conviction was admissible, which is why he "conceded" it.

Counsel admitted that he knew about the victim's prior felony conviction of aggravated battery, but he did not recall being aware of the fact that the victim served seventeen months for the conviction in Florida. Counsel stated, however, that he thought the conviction was a misdemeanor but that, had he known about the seventeen months, he "would have known it was a felony." Counsel later confirmed that he must have known about the seventeen months because the victim had mentioned it to a detective when he interviewed her, and Counsel received a "CD" copy of that interview in discovery. Counsel stated that he thoroughly cross-examined the victim on the facts of the case and on the "ludicrousness" of her claims against the Defendant.

Counsel further stated that the Defendant "sent him a letter coming up with 10 or 15 different mandates" for him to do. Counsel testified that he tried to comply with the "laundry list" of demands, but the Defendant's "idea of relevancy and feasibility of obtaining information and doing things was way off the charts." As a result of the Defendant's demands, Counsel "knew he would be here today" on allegations of ineffective assistance of counsel.

Based on the evidence heard at the motion for new trial, the trial court issued an order denying the Defendant's motion. The trial court, however, did find that Counsel was deficient for mistaking the victim's felony conviction for aggravated battery for a

8

misdemeanor. The trial court stated that the Defendant did not show that Counsel's deficiency either deprived him of a fair trial or prejudiced the defense.

## C. Error Coram Nobis Hearing

The Defendant[1] filed a writ of error coram nobis, requesting a new trial based on newly discovered evidence. The Defendant contends that the victim was diagnosed as "delusional" four months prior to her allegations of kidnapping against the Defendant, and, if the jury had known the victim was delusional, it would have been less likely to credit her testimony, which would likely result in a different verdict.

Elizabeth Maxwell Rogers, a psychiatric nurse practitioner with Volunteer Behavior Mental Health, testified that she saw the victim on December 20, 2008. Rogers stated that the victim "was shaking, having flashbacks, nightmares, jumpy, anxious, panic attacks regularly, increased depression, isolation, not sleeping well, appetite changes, irritable, anxiety, po[o]r focus and memory, indecisive, problems with motivation." When asked about the "plan of care" she made for the victim, Rogers testified that the plan identified two problems she saw with the victim, one of which was delusions. Rogers, however, stated that she didn't "think delusions should be there." She continued, "I don't agree with it at this point." She said that she would "question it" in this case. Rogers then read her treatment notes, which stated that the victim was beaten by her boyfriend at the time of treatment, that she was molested by her father, and that she wrote a book, entitled "Daddy's Dirty Little Secrets," about the abuse she experienced as a child. Rogers stated that a social worker did a "Google" search for the book, but found that no such book existed. The victim had trouble sleeping and reported she had taken Zoloft, Zyprexa, and Prozac. Rogers diagnosed the victim with depression and post-traumatic stress disorder. Rogers prescribed Prozac and Zyprexa to the victim to help control her insomnia, mood, and delusional thinking. Rogers described "delusional thinking" as "believing things that are not true and they are usually mood-congruent. When you are very depressed[,] you begin to see things, perceive things differently that aren't accurate." Rogers opined that, "if [the victim] was in a particular mood, she may become delusional thinking." Rogers, however, did not diagnose the victim with a personality disorder. Rogers testified that the victim did not return for "actual treatment" after her December 20, 2008, visit. She stated that she would not have given the victim a prescription that would have lasted more than a few weeks or a month.

---

[1] In a petition for writ of error coram nobis, the party requesting the relief is normally referred to as the "Petitioner." However, because the direct appeal and the petition for writ of error coram nobis are addressed cumulatively, we will refer to the appealing party as "Defendant" throughout the opinion for the sake of consistency and simplicity.

The victim testified that she wrote a four- to five-chapter book, called "Daddy's Dirty Little Secrets," when she moved to Tennessee from Florida. She testified that it was never published, she never sold it, and she has since lost her copy of it. She stated that, in Florida, she collected signatures on a petition to change a law on child sex abuse. She stated that she went on talk shows, Geraldo Rivera and Sally Jesse Raphael, with her sisters. She testified that her father had four children with one of her older sisters. The victim admitted that she had previously been convicted of felony assault in Florida because she attacked her "step, foster father" for telling her that he had sex dreams about her. The victim acknowledged that she submitted a claim to the Tennessee Victim Compensation fund for a "sexual oriented crime." The victim received $2,500.00 as a result of that claim. She also recalled submitting her December 2008 diagnosis from Volunteer Behavior Mental Health to the Crimes Compensation Office.

Dr. Matthew Norman, a board-certified forensic psychiatrist, testified that he was asked to look at the victim's mental health issues in this case. Dr. Norman opined that, after considering various documents in the record and observing witness testimony, the victim suffered from delusional thinking. Although Dr. Norman had not personally examined the victim, he specifically based his opinion on the following: the transcript of the victim's initial police interview, which showed that "even at that time the law enforcement who were interviewing her were wondering whether some of the claims she made were accurate;" the victim's testimony; Roger's diagnosis of the victim as depressed with psychotic features that included delusions; and "evidence that most likely [the victim] was not taking the Zyprexa in the or around the time of April of 2009 based on Ms. Rogers' testimony that they wouldn't have dispensed more than a month or two."

The trial court issued an order denying the Defendant's writ of error coram nobis, finding that the information at issue was known to the Defendant prior to trial in November 2009:

> [C]ross-examination of the victim during the trial indicates, and further inquiry and process could have been pursued by the [D]efendant, as has been done with success since his first request of this court. . . . The information that is the subject of this hearing was within the Tennessee Division of Claims Administration agency [on] January 6, 2010.

The trial court found that "reasonable diligence would have lead to the discovery of the 'new information' prior to the Motion for New Trial or the Sentencing hearing therefore the information is not newly discovered evidence." The trial court further found that "the evidence would have been cumulative to all of the other evidence that was a part of the trial relative to the victim's credibility and it serves no other purpose."

10

It is from these judgments that the Defendant now appeals.

## II. Analysis

On direct appeal, the Defendant argues the following: (1) for numerous reasons, he was denied his right to the effective assistance of counsel; (2) the trial court erred when it limited cross-examination of the victim on the issue of a possible motive for a false accusation; (3) prosecutors engaged in misconduct by making improper and prejudicial comments and arguments to the jury; and (4) the trial court erred in failing to consider new evidence presented during the motion for new trial. Further, in his appeal from the denial of his writ of error coram nobis, the Defendant argues that the trial court erred when it denied his petition because, had the jury known that the victim was delusional, it would have been less likely to credit her testimony, which would likely result in a different verdict.

## A. Direct Appeal

### 1. Ineffective Assistance of Counsel

The Defendant argues that he was denied his right to the effective assistance of counsel because Counsel failed to do the following: (1) cross-examine the victim about her prior conviction for prostitution; (2) impeach the victim with her prior felony conviction for aggravated battery; (3) object to the State introducing evidence of multiple identifications possessed by the Defendant; (4) object to questioning by the State regarding prior bad acts of the Defendant; and (5) object to certain comments and statements made by the State during voir dire, the State's opening statement, and the State's closing argument. The State argues that the Defendant has not proven by clear and convincing evidence that Counsel rendered deficient performance, or that any deficiency was prejudicial to the Defendant. Further, the State argues that, where the trial court found Counsel to be deficient with regard to his failure to impeach the victim with a prior felony conviction because of his own misunderstanding, the trial court correctly found that the Defendant failed to establish how he was prejudiced by that deficiency.

Claims of ineffective assistance of counsel are generally more appropriately raised in a petition for post-conviction relief rather than on direct appeal. *See State v. Carruthers*, 35 S.W.3d 516, 551 (Tenn. 2000). This Court has consistently "warned defendants and their counsel of the dangers of raising the issue of ineffective assistance of trial counsel on direct appeal because of the significant amount of development and fact finding such an issue entails." *Kendricks v. State*, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999). Raising the issue of ineffective assistance of counsel on direct appeal is "a practice fraught with peril." *State*

11

*v. Thompson*, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997). This peril is two-fold. First, ineffective assistance can rarely be established without an evidentiary hearing. *See Strickland v. Washington*, 466 U.S. 668, 689-90, 694 (1984). Post-conviction procedures afford an evidentiary hearing to a Defendant with colorable claims. *See* T.C.A. §§ 40-30-109(a), -110 (2006). Second, raising the issue in the direct appeal could result not only in losing on appeal, but also in barring the claimant from raising the issue later in the post-conviction arena. T.C.A. §§ 40-30-106(f) & (h) (2006). A post-conviction claim for ineffective assistance of counsel will be dismissed when that claim has previously been determined by another court. T.C.A. § 40-30-106(f) (2006). "A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence." T.C.A. § 40-30-106(h) (2006). However, because there is nothing barring a defendant from bringing an ineffectiveness of counsel claim in a direct appeal, we will proceed with our analysis of each of the Defendant's claims.

Under Tennessee Code Annotated section 40-30-110(f), a defendant seeking post-conviction relief on the basis of ineffective assistance of counsel is required to prove his or her allegations "by clear and convincing evidence." This same standard applies when the claim of ineffective assistance of counsel is raised on direct appeal. *State v. Burns*, 6 S.W.3d 453, 461 n.5 (Tenn. 1999) (*citing State v. Anderson*, 835 S.W.2d 600, 607 (Tenn. Crim. App. 1992)). The factual findings entered by the trial court are conclusive unless the defendant establishes that the evidence preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a defendant must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If a defendant shows that counsel's representation fell below a reasonable standard, then the defendant must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

### a. Failure to Cross-Examine the Victim on her Prostitution Conviction

13

The Defendant alleges that Counsel was ineffective because he did not cross-examine the victim on her prior prostitution conviction. The State responds that Counsel's actions were not deficient because, even though the Defendant claims that the prostitution conviction supported his theory of defense, the Defendant testified at trial and the jury rejected the Defendant's theory of defense. Therefore, the State argues that the trial court properly denied the Defendant relief on this issue.

This Court has previously noted that "cross-examination is a strategic and tactical decision of trial counsel, which is not to be measured by hindsight." *State v. Kerley*, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991). "Allegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." *Taylor v. State*, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991). Such deference to the tactical decisions of counsel, however, applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Addressing specific examples of proper case preparation, the Tennessee Supreme Court "cited with approval the duties and criteria set forth in the American Bar Association Standards for the Defense Function." *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006). Listed among that criteria is the expectation that defense counsel develops a defense based on adequate legal and factual research:

> Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed . . . . This means that in most cases a defense attorney, or his agent, should interview not only his own witnesses but also those that the Government intends to call, when they are accessible. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. And, of course, the duty to investigate also requires adequate legal research.

*Id.* (quoting *Baxter*, 523 S.W.2d at 936 (quoting *United States v. DeCoster*, 487 F.2d 1197, 1203-04 (D.C. Cir. 1973))). Further, this Court has long held that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). As a result, this Court does not speculate as to what the witnesses may have said if presented or how other witnesses may have responded to a rigorous cross-examination. *Id.*

At the motion for new trial hearing in this case, Counsel testified that he believed that the victim's prostitution conviction was not admissible because it was a misdemeanor

14

offense:

> Q. Do you recall a conference just before the trial started with the jury outside . . . where the issue was brought up and you agreed not to inquire of [the victim] about that prior prostitution charge?
>
> A. I think I remember that, yes.
>
> Q. All right. Now, was your decision to [] pursue that based upon the fact that it was a misdemeanor and the rule only says felony convictions?
>
> A. That's basically it. I don't think it was admissible under the rules. That's correct.

Counsel was asked whether he "consider[ed] what other evidence rules [he] might be able to admit that under other than the impeachment by prior convictions" rule. Counsel responded that he thought "the jury could have easily found that she [went to the Defendant's residence] as a prostitute, consensually" as a result of the circumstantial evidence presented in trial. Counsel continued, "[the case] had prostitution written all over it, you didn't have to go into anything." On cross-examination, Counsel further reiterated his reason for not impeaching the victim with the conviction:

> Q. Would this be a true statement, that you chose not to attack the victim . . . in regard to a prostitution conviction . . . from Florida because there was overwhelming evidence, there was horrific evidence and flight by your client at that time, that you did not want to appear to be attacking her again?
>
> . . . .
>
> A. Well, I don't think that was the reason I did it, I mean as far as those convictions. In other words, I don't think the prostitution was admissible and that's why I conceded that.

The record reflects that neither Counsel nor the State presented evidence at trial to corroborate the Defendant's claim that the victim was a prostitute. The trial court did not directly address the victim's prostitution conviction in the order denying the Defendant's motion for new trial.

In our view, it would have been preferable for the Defendant to offer testimony from the victim at the motion for new trial hearing regarding her prostitution conviction. Her prior conviction is, however, a part of the record and the State does not contest that the victim had

15

been previously convicted of prostitution. Considering this specific set of facts, we address the merits of the Defendant's argument.

In the present case, the record reflects that Counsel did not omit mention of the victim's prostitution conviction for strategic or tactical reasons. Rather, Counsel based his decision upon faulty legal reasoning that the prostitution conviction was not admissible under the rules of evidence because it was a misdemeanor. As admitted through his own testimony, Counsel only considered the admissibility of the conviction pursuant to Tennessee Rules of Evidence Rule 609, which allows impeachment by evidence of criminal convictions. Because the prostitution conviction was a misdemeanor, Counsel categorized the conviction as inadmissible for impeachment. Counsel failed to consider other evidentiary rules under which the prostitution conviction could have been introduced.

Furthermore, the Defendant's main defense was that the victim acted as a prostitute, agreeing to accompany the Defendant on his motorcycle to his residence and engage in sexual relations with him. In our view, an effective cross-examination of the victim by Counsel should have included an inquiry about the victim's prior history of prostitution, with the prior conviction for prostitution being available for impeaching the victim's testimony. We conclude that Counsel's decision was not informed by adequate preparation or legal research.

In light of all of the evidence presented at trial, we are not convinced that the Defendant has shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols*, 90 S.W.3d at 587. The jury was presented with the Defendant's testimony that his sexual encounter with the victim was consensual, and that the victim was actually engaged in prostitution and became upset when the Defendant declined to pay the victim. The prostitution issue was therefore considered by the jury. The jury also heard the victim's testimony regarding the non-consensual nature of the sexual relations that occurred, which included testimony from the victim and Maggie Dale that the victim ran naked and screaming from the Defendant's home to Dale's home to escape from the Defendant. We agree with the trial court that the Defendant is not entitled to relief on this issue.

### b. Failure to Impeach the Victim with a Prior Felony Conviction

The Defendant argues that Counsel was ineffective because he failed to impeach the victim with her prior felony conviction for aggravated battery. In its response, the State points out that the trial court found that Counsel was deficient in his understanding of the victim's prior criminal record, but it found that the Defendant did not show that he was prejudiced by that deficiency. The State argues that Counsel correctly made a strategic

16

decision not to use the felony conviction to impeach the victim because it "was not an appealing conviction to use to impeach the victim because it had nothing to do with her integrity in his opinion."

At the hearing on the motion for new trial, Counsel testified that he knew about the victim's prior felony conviction of aggravated battery, but he did not remember knowing that she served seventeen months on that conviction. Initially, Counsel believed that the conviction was a misdemeanor. However, he later conceded that he must have known it was a felony because the victim revealed the length of her sentence in her statements to authorities, which Counsel reviewed. Counsel further testified that the victim's aggravated battery felony conviction was not a conviction he considered "particularly impeaching." Counsel considered impeaching a witness with prior felony convictions as "overplayed." He stated that he would have considered using the felony "if it had something to do with integrity." He testified that, although "[t]he rule allows you to do it . . . , I have never really thought that it was all that useful . . . ."

The trial court found that Counsel was deficient in his understanding of the victim's prior criminal record. The trial court, however, found that the Defendant failed "to establish clear and convincing proof that any deficiency prejudiced the defense in this case."

As mentioned above, this Court has previously held that "cross-examination is a strategic and tactical decision of trial counsel which is not to be measured by hindsight." *Kerley*, 820 S.W.2d at 756. "Allegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." *Taylor*, 814 S.W.2d at 378. In this case, we hold that the Defendant established that the evidence preponderates against the trial court's findings. *Fields*, 40 S.W.3d at 457. Counsel's reasoning did not appear to be based upon strategy or tactic. First, Counsel testified that he believed the conviction was a misdemeanor, making it inadmissible; however, he corrected himself later in his testimony, stating that he must have known it was a felony because he had the victim's statements to police. He then stated that, either way, he "would not consider [the victim's aggravated battery conviction] particularly impeaching." Although that portion of Counsel's testimony could be interpreted as a "strategic" reason for omitting the felony conviction from the cross-examination of the victim, Counsel never definitively explained his strategy. Rather, he simply said that he did not find the conviction to be "useful." This Court does not find Counsel's reasoning to be strategic or tactical. As the trial court found in its order, Counsel in this case overlooked information provided to him in discovery and misunderstood that the victim's prior conviction was a felony rather than a misdemeanor. We agree with the trial court that his oversight amounted to deficient performance by Counsel. We also conclude that such deficiency did not create "a reasonable probability" that the trial would have had a different outcome had the jury known about the victim's

17

felony conviction. *See Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d at 587. The State presented both direct and circumstantial evidence against the Defendant. In our view, the evidence upon which the jury convicted the Defendant was certainly strong. We do not believe, based on all of the evidence presented at the Defendant's trial, that the introduction of the victim's prior felony conviction created "a probability sufficient to undermine confidence in the outcome." *See Strickland,* 466 U.S. at 694. We, therefore, conclude that the Defendant did not establish by clear and convincing evidence that this deficiency prejudiced him. The Defendant is not entitled to relief on this issue.

### c. Counsel's Failure to Object to the Introduction of the Defendant's Possession of Multiple Identifications

The Defendant argues that Counsel was ineffective for not objecting to the State's introduction of and reference to multiple "identifications" possessed by the Defendant. The State argues that Counsel made a strategic decision to not object because the Defendant was indicted under two names.

This Court has long held that Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams*, 599 S.W.2d at 279-80. In this case, the record shows that the Defendant was indicted under two names and Counsel knew that the Defendant had numerous documents with his various names. Counsel testified that there was no dispute to the fact that the identifications all identified the Defendant as the physical person, "[s]o identification was not really an issue."

On appeal, the Defendant argues that evidence of the Defendant's possession of multiple "identifications" is both irrelevant and prejudicial. The Defendant argues that the evidence is not relevant because the Defendant has not denied that he is the person who was involved with the victim during the events that led to his criminal charges. The Defendant argues that the evidence is prejudicial because the jury may have believed that his possession of multiple "identifications" indicated that he is a criminal or is "hiding something."

In our view, under the circumstances in this case, Counsel should have objected to the introduction of this evidence. However, we are again unconvinced that the Defendant has demonstrated prejudice; therefore, he is not entitled to relief on this issue.

### d. Counsel Failed to Object to Questioning by the State on Prior Bad Acts

The Defendant argues that Counsel was ineffective because he failed to object to questions during the State's cross-examination of the Defendant regarding an instance in

which he handcuffed another woman.  The State contends that the Defendant did not deny the occurrence and that he had a full opportunity to refute the claim.  The State argues that Counsel was not deficient nor was the Defendant prejudiced by the questions.

Because the Defendant presented no evidence at the motion for new trial hearing to support this argument and because he makes no citations to any authority to support his argument, we conclude that the Defendant has waived our review of this issue.  The Rules of Appellate Procedure require that citations to authority and references to the record be included in the argument portion of the brief.  Tenn. R. App. P. 27(a)(7).  The rules of this Court also contemplate waiver of issues not supported by citation to authorities or appropriate references to the record.  *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").  We deem this issue waived due to the Defendant's failure to cite to any legal authorities.

### e.  Counsel Failed to Object to Comments and Statements by the State that amounted to Prosecutorial Misconduct

The Defendant argues that the State "made several egregious statements and arguments amounting to prosecutorial misconduct," and Counsel was ineffective for failing to object.  The State contends that Counsel was not deficient in this regard, and the Defendant failed to establish how he was prejudiced by Counsel on this issue.

During the motion for new trial hearing, Counsel testified that he did not believe that anything the State said was "an expression of a personal opinion."  Rather, Counsel stated that it "is an attorney's job . . . to take a set of fact[s] and put a label on them, to tweak it a certain way or put a spin on it and force the facts and put a label on it."  Counsel testified that he did not see any reason to object.  Specifically, Counsel testified that he thought it was "appropriate" in this case for the State to refer to the Defendant as "a sociopathic predator."

In the Defendant's appellate brief, his only argument is that Counsel failed to object to "several egregious statements and arguments amounting to prosecutorial misconduct." The Defendant, however, does not mention the specific statements in the argument section of his brief, nor does he cite to relevant legal authority to support his claim.  Therefore, we conclude that the Petitioner has waived this issue because he failed to cite to any authorities in support of his argument in his appellate brief.  Tenn. Ct. Crim. App. R. 10(b); *see also* Tenn. R. App. P. 27(a)(7).

### 2. Scope of Cross-Examination

The Defendant argues that the trial court erred when it limited his cross-examination of the victim about an assault committed against the victim by her boyfriend, contending that the trial court denied him the ability to present a complete defense. The Defendant argues that the testimony was necessary to establish two points: (1) "[The boyfriend] was angry at the . . . victim for not earning as a prostitute and not getting money from the Defendant[,] which would have greatly supported the Defendant's trial theory and provided a motive on her part to fabricate the . . . kidnapping;" and (2) "the details . . . could have demonstrated that [the victim] was not credible or believable . . . ." The State argues, first, that the Defendant waived his complaint on this issue because he failed to make an offer of proof as to how the victim would have testified, and, in the alternative, the State argues that the record does not indicate that, through such testimony, the Defendant attempted to show that the victim made a false accusation; therefore, the Defendant cannot show that he received an unfair trial, and the trial court acted within its discretion in limiting the testimony. We agree with the State.

In the motion for new trial order, the trial court found that the Defendant "failed to prove that issues as error by the court . . . deprived the [D]efendant of a fair trial and call into question the reliability of the outcome."

Although it is true, as the State contends, that the Defendant did not make an offer of proof at the motion for new trial hearing as to what the victim's testimony would have been, the victim did acknowledge that, after the incident at issue in this case, her boyfriend committed acts of domestic violence against her. Considering this specific set of facts, we address the merits of the Defendant's argument.

The point of the Defendant's argument is to show that the trial court improperly limited Counsel's attempt to impeach the victim's testimony and her credibility. Generally speaking, a denial of the right to an effective cross-examination is "constitutional error of the first magnitude and amounts to a violation of the basic right to a fair trial." *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980). The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the discretion of the trial court. *State v. Reid*, 164 S.W.3d 286, 348 (Tenn. 2005); *see also State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997) (holding that a trial court's evidentiary ruling based on relevance is reviewed on appeal for an abuse of discretion). Appellate courts may not disturb limits on cross-examination except when there has been an unreasonable restriction on the right. *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995).

In the present case, on cross-examination, the Defendant, through Counsel, asked the victim about her boyfriend's violent behavior towards her. The victim admitted that, after the kidnapping incident by the Defendant, she sought two domestic assault charges against

her boyfriend and that he was convicted on both charges. The State objected, stating that the information the Defendant attempted to elicit was irrelevant. The trial court agreed and sustained the objection. We conclude that this ruling was within the sound discretion of the trial court. *See Reid*, 164 S.W.3d at 348. Nothing in the record suggests that the Defendant was unduly prejudiced by this ruling, and we do not believe the ruling was an unreasonable restriction on her right to cross-examination. Thus, the Defendant is not entitled to relief on this issue.

### 3. Prosecutorial Misconduct

The Defendant contends that the trial court erred when it denied the Defendant's motion for new trial based on the prosecutor's alleged misconduct; therefore, the Defendant was denied his right to a fair trial. The Defendant asserts that the State engaged in prosecutorial misconduct when it referred to the victim as "our victim" during voir dire, stated that what the Defendant "did has all the hallmarks of a sick man" in the opening statement, stated that the Defendant has a predatory personality in closing argument, and stated that the Defendant "is a sociopathic predator and he's in your community" in closing argument. The State argues, first, that the Defendant waived this issue for failure to raise a contemporaneous objection, and, in the alternative, the trial court acted within its discretion when it permitted the State's arguments absent any objection from the Defendant. Therefore, the State contends that the statements did not prejudice the Defendant.

During the hearing on the motion for new trial, Counsel testified that he did not believe that anything the State said was "an expression of a personal opinion." Rather, Counsel stated that it "is an attorney's job . . . to take a set of fact[s] and put a label on them, to tweak it a certain way or put a spin on it and force the facts and put a label on it." Those are the kinds of things I do in closing arguments." Counsel testified that he did not see any reason to object. Specifically, Counsel testified that it thought it was "appropriate" in this case for the State to refer to the Defendant as "a sociopathic predator." The trial court found, in its order denying a new trial to the Defendant, that the Defendant "has failed to prove that . . . prosecutorial misconduct deprived the [D]efendant of a fair trial and call into question the reliability of the outcome."

We have recognized five general areas of prosecutorial misconduct pertaining to jury argument: (1) intentionally misstating the evidence or misleading of the jury on the inferences it can draw; (2) expressing personal beliefs or opinions; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) adding outside issues to the guilt or innocence issue; and (5) arguing or referring to outside facts. *State v. Goltz*, 111 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003). Of course, if the trial court took curative measures, such as proper jury instructions, such measures will likely render the misconduct harmless.

*State v. Chico McCracken*, No. W2001-03176-CCA-R3-CD, 2003 WL 1618082, at *8 (Tenn. Crim. App., at Jackson, Mar. 24, 2003), *perm. app. denied* (Tenn. Sept. 2, 2003).

Further, when a prosecutor has engaged in improper conduct, the test for determining whether there is reversible error is "whether the impropriety 'affected the verdict to the prejudice of the defendant.'" *State v. Bigbee*, 885 S.W.2d 797, 809 (Tenn. 1994) (quoting *Harrington v. State*, 385 S.W.2d 758, 759 (1965)). In making this determination, we consider the following: (1) the conduct complained of in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case. *State v. Chalmers*, 28 S.W.3d 913, 917 (Tenn. 2000).

The State is correct that the Defendant risked waiving review of this issue by failing to contemporaneously object to the statements. *See* Tenn. R. App. P. 36(a); *State v. Griffis*, 964 S.W.2d 577, 599 (Tenn. Crim. App. 1997). The Defendant challenges statements made by the State in voir dire, its opening statement, and its closing arguments. The Defendant did not object during these instances. Typically, when a prosecutor's statement is not the subject of a contemporaneous objection, the issue is waived. Tenn. R. Crim. P. 33 and 36(a); *State v. Thompson*, 10 S.W.3d 299, 234 (Tenn. Crim. App. 1999); *State v. Green*, 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997); *State v. Little*, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992). We may, however, review the record for plain error.

Whether an issue rises to the level of plain error is a decision that lies within the sound discretion of the appellate court and may be considered: (1) to prevent needless litigation; (2) to prevent injury to the interests of the public; and (3) to prevent prejudice to the judicial process, prevent manifest injustice, or to do substantial justice. *See* Tenn. R. App. P. 13(b); Tenn. R. Crim. P. 36(b); *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn.2000) (adopting *State v. Adkisson*, 899 S.W.2d 626, 638-39 (Tenn. Crim. App. 1994)). In *Adkisson*, this Court stated that the following factors should be considered by an appellate court when determining whether an error constitutes "plain error": (a) the record must clearly establish what occurred at the trial court; (b) a clear and unequivocal rule of law must have been breached; © a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the issue is "necessary to do substantial justice." *Smith*, 24 S.W.3d at 282 (quoting *Adkisson*, 899 S.W.2d at 641-42 (citations omitted)). Our Supreme Court characterized the *Adkisson* test as a "clear and meaningful standard" and emphasized that each of the five factors must be present before an error qualifies as plain error. *Smith*, 24 S.W.3d at 282-83. In addition, "'the 'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial.'" *Id.* at 283 (quoting *Adkisson*, 899 S.W.2d at 642).

### a. Voir Dire

The Defendant argues that, during voir dire, the State "inappropriately expressed a personal belief or opinion as to the truthfulness of the [] victim" by referring to her as "our victim." The State argues that the Defendant made no objection to the characterization of the victim and that the statement does not fall under any of the areas of misconduct set out in *Goltz*. *See Goltz*, 111 S.W.3d at 5-6.

The Defendant's brief cites to a portion of the trial transcript at which the State asked the group of prospective jurors whether "anyone else [has] a problem sitting in judgment of another individual?" The State continued, " . . . you have got to decide which side you believe, and you are going to look at the credibility of the witnesses, whether they are [D]efendant or whether they are victim." The State then said, "Let me begin by saying this case does not involve the best judgment of our victim []." The Defendant argues that, by the State referring to the victim as "our," it implied that "the witness had a special relationship with the State."

After examining the context of the State's comment, it is apparent that the State was in the process of introducing the victim and her role in the case. The State used the statement in the context of telling the jury that their task would be to determine the credibility of the witnesses, as presented by the different parties, the State and the Defendant. The use of "our victim" by the State clarifies to the jury that the State would be presenting the victim's testimony. In other words, the victim was "their" witness, hence, the use of "our victim." We, therefore, disagree with the Defendant that the comment was improper or prejudicial. We conclude that the Defendant's substantial right to a fair trial was not adversely affected by the State's characterization of the victim, in this context, as "our victim." Tenn. R. App. P. 36(b)*; Adkisson*, 899 S.W.2d at 641-42 (citations omitted). Thus, the Defendant is not entitled to relief on this issue.

### b. Opening Statements

The Defendant contends that the State exhibited prosecutorial misconduct during opening statements when it stated the following:

> . . . None of this makes any sense. People that do these things are not normal and this is the situation you are going to have to judge. What [the Defendant] did has all the hallmarks of a sick man. He talked to her, she talked to him, she will tell you they had no sex. If she wanted to exaggerate in this case[,] I suppose she could throw that in[,] but she will tell you that. . . .

23

The Defendant argues that the State saying that the Defendant "has all the hallmarks of a sick man" had "no useful legitimate purpose . . . the only reason to make the comment was to inflame the passions of the jury." The State argues that the statement was proper because the jury could conclude that the Defendant was, indeed, a "sick man" from the evidence presented by the State.

Upon review of the record, we conclude the State's comment does not amount to plain error because no clear and unequivocal rule of law has been breached. *Smith*, 24 S.W.3d at 282. An opening statement allows the attorneys for each side to present their theories of the case. "Trial courts have wide discretion in controlling arguments of counsel, including opening statements . . . ." *State v. Johnson*, No. W2004-00464-CCA-R3-CD, 2005 WL 645165, at *14 (Tenn. Crim. App., at Jackson, March 15, 2005) (citing *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)), *perm. app. denied* (Tenn. Aug. 29, 2005). The State, in this case, described the evidence it planned to present and explained the conclusion it wanted the jury to reach from that evidence. Further, the record reflects that the trial court explained the following, with regard to opening statements, in its charge to the jury: "If any statements were made that you believe are not supported by the evidence, you should disregard them." Lastly, the Defendant has failed to show that he was prejudiced by the comment. *Smith*, 24 S.W.3d at 283. Therefore, the Defendant is not entitled to relief as to this issue.

### c. Closing Argument

The Defendant asserts that some of the State's statements during closing argument were improper and amounted to prosecutorial misconduct. The State said the following in its closing argument:

> . . . let's take the worst case scenario if you want to believe ever[y] single thing he says, every word, suppose she came up here with the expectation of money, and the facts refute that, but suppose that is true and you want to believe that, she was still[,] by the proof I submit to you[,] a victim of especially aggravated kidnapping. She didn't come up here to be done like this, to be confined against her will. And you can judge her as a person that maybe has been kicked around by life, a person who is vulnerable, a person who is an easy target, a person who wouldn't be missed very much if she were gone a few days. That's exactly what a predatory personality seeks, and if you can't protect her[,] you cannot protect any of us. . . .
>
> . . . .
>
> Ladies and gentlemen, this man, [the Defendant], is a sociopathic

24

predator and he is in your community. . . .

The Defendant argues that stating that the Defendant has "a predatory personality" and that he "is a sociopathic predator . . . in your community" have "no legitimate purpose" and were "only made to inflame the passions of the jury." The State contends that the comments were proper and were conclusions that would necessarily follow if the jury believed the testimony of the State's witnesses.

In determining whether the State's comments violated a clear and unequivocal rule of law, therefore amounting to plain error, we first note that our Supreme Court has recognized that closing argument is a valuable privilege for both the State and the defense and that counsel is afforded wide latitude in presenting final argument to the jury. *See State v. Cribbs*, 967 S.W.2d 773, 783 (Tenn. 1998); *State v. Cone*, 665 S.W.2d 87, 94 (Tenn. 1984). However, a party's argument "must be temperate, predicated on evidence introduced during trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Middlebrooks*, 995 S.W.2d 550, 568 (Tenn. 1999). Further, the Defendant must prove that "'the 'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial.'" *Smith*, 24 S.W.3d at 283 (quoting *Adkisson*, 899 S.W.2d at 642).

We have reviewed the Defendant's allegations of prosecutorial misconduct in the context of the entire argument and are not convinced of plain error. The Defendant testified that the victim was a prostitute who engaged in consensual sexual acts with him, and the evidence presented by the State showed that the Defendant sought out, detained, and mistreated the victim. We conclude that the argument in which the Stated referred to the Defendant as a "sociopathic predator . . . in your community" is possibly inflammatory, but we also conclude that these remarks were not so harmful or "so inflammatory that [they] affected the verdict." *See State v. Reid*, 164 S.W.3d 286, 344 (Tenn. 2005); *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965). The Defendant is not entitled to relief on this issue.

### 4. Newly Discovered Evidence

The Defendant argues that his due process rights were violated because the trial court failed to consider newly discovered evidence at the hearing on his motion for new trial.

At the motion for new trial, the trial court acknowledged that it had received the victim's medical records, pursuant to the trial court's previous Order to Compel Production of Medical Records under Seal. At the time of the hearing, the trial court had not reviewed the records to determine whether they were relevant to the case. After a lunch recess, the

trial court had reviewed the records and asked the Defendant, through his new counsel ("Defense Counsel"), to explain to the trial court what he wanted to do with the records. Defense Counsel explained that the Defendant wanted the records admitted into evidence in order to determine whether they were newly discovered evidence. Defense Counsel stated the following:

> . . . Any new evidence which is exculpatory to the [D]efendant should be admissible on a motion for new trial if the time frames are met, you know, if it is presented timely. . . . that would be new evidence after the trial that I think, even though it's after the trial and could not have been presented at the trial, it certainly would be presentable in a motion for new trial to ask this Court to set aside the verdict. Now, we don't have that strong of evidence but what I'm suggesting, Judge, is this: if in fact those medical records support that she was diagnosed with post-traumatic stress syndrome before this kidnapping . . . and she used that prior diagnosis to later [file a claim with the State], when in fact she didn't because the diagnosis had occurred before. That, Judge, is relevant to help prove [the Defendant's] innocence because it helps prove a motive on her part for fabrication of her testimony at trial . . . that puts her credibility squarely in issue . . . I don't know exactly if those records support that or not but if they do, . . . I think that is relevant and exculpatory.

At that point, the trial court stated that the medical records did not appear to be "as complete as we intended them to be." The trial court then stated that it could not "rule that [the victim] got any treatment after this based on [the records before the trial court]." The trial court explained to both the State and the Defendant that "this record is something that you all can both look at and argue that, about whether or not this is some type of newly discovered evidence as part of the motion for new trial." At that time, the trial court asked the parties to address the issues in the motion for new trial.

After both sides presented their evidence on the issues listed in the motion for new trial, the trial court asked the following: "[H]ow do you all feel [about] these records potentially enter[ing] into this hearing we are having today?" Defense Counsel then requested that the medical records "be put as a part of the record and be considered by the Court in it's decision." Without addressing Defense Counsel's request, the trial court decided that both parties needed to review the medical records "in their entirety" in order to decide how they wanted to proceed. At that point, the trial court took a recess in order for both parties to examine the medical records. The trial court reconvened, and the parties presented their closing arguments. After closing arguments, during which both parties addressed the relevance of the medical records, the trial court resealed the medical records

and stated the following: "You all have had the opportunity to review them, and you know, I will just leave that to your all's judgment about what, if additional, anything had to be filed or not . . . ."

In its written order denying the Defendant's motion for new trial, the trial court said the following regarding the medical records:

Finally[,] Medical Records of [the victim] under seal in the Court file have been reviewed by Counsel for both sides. Counsel for Defense did not Move to Continue the Motion for New Trial after review of those records or to add them as a ground of the Motion for New Trial. They appear to the [C]ourt to be newly discovered evidence that was not known to either side prior to the trial or the Motion for New Trial. They will not be considered by the Court at this time for any purpose as no Motion to do so was made by either side.

To be entitled to a new trial on the basis of newly discovered evidence, a defendant must show: (1) that he or she used reasonable diligence in seeking the newly discovered evidence; (2) that the new evidence is material; and (3) that the new evidence will likely change the result of the trial. *See State v. Nichols*, 877 S.W.2d 722, 737 (Tenn. 1994). Whether to grant a new trial on the basis of newly discovered evidence lies within the sound discretion of the trial court. *See State v. Caldwell*, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997). Accordingly, we review this issue for an abuse of discretion. *See State v. Meade*, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996).

After review of the record, we conclude that the trial court did not abuse its discretion when it refused to consider the evidence in the medical records. As referenced above, the dialog between the trial court and both parties appeared to indicate that a consensus was not reached as to how to proceed on the issue of the medical records. The trial court repeatedly mentioned that it was confused as to the contents of the records. It appears to this Court that the trial court never reached the point of hearing arguments regarding the medical records as a ground for the motion for new trial. This is evidenced by the fact that the trial court asked several questions about both parties' knowledge of the content of the medical records, gave them time during the hearing to review the sealed documents, and ended the hearing by telling the parties that it would be up to them to file additional documents to address the issue.

Furthermore, neither side filed any motions on the matter nor asked for a definitive ruling on the relevancy of the medical records to the motion for new trial. Specifically, after viewing the medical records during the hearing, the Defendant did not request a continuance

27

or file any additional motions to indicate that he wanted to properly present the matter before the trial court as a ground for a new trial; therefore, we conclude that the trial court acted within its discretion, based on its understanding of the arguments presented at the hearing on the motion for new trial, when it denied consideration of the evidence. Further, this Court notes that the Defendant had an opportunity to be heard on this issue in his Writ of Error Coram Nobis, which is addressed below. Accordingly, we deny relief to the Defendant on this issue.

## B. Writ of Error Coram Nobis

On appeal, the Defendant contends that the coram nobis court erred when it denied his petition for coram nobis relief. Specifically, the Defendant argues that "[n]ewly discovered evidence demonstrated that four months prior to her allegations [the victim] was diagnosed as psychotically delusional and was likely delusional on the date of the offense." To support its argument, the Defendant points out that, on his Motion for New Trial, the trial court found that the medical records were "newly discovered evidence," but then "turns around and claims that the evidence was not newly discovered in its order denying the writ of error coram nobis" The Defendant further claims that "[h]ad the jury known of her diagnosis[,] their verdict may have been different." The State argues that the evidence cannot be considered newly discovered because the "evidence existed before the [D]efendant's trial" and that the Defendant cannot demonstrate that he was without fault in failing to present the evidence.

In its order denying coram nobis relief, the coram nobis court found:

The information that is the subject of the Writ of Error Coram Nobis was known to the [D]efendant in November of 2009, as cross examination of the victim during the trial indicates, and further inquiry and process should have been pursued by the [D]efendant, as has been done with success since his first request of this court. . . . . The information that is the subject of this hearing was within the Tennessee Division of Claims Administration agency in January 6, 2010.

Therefore, the Court finds that reasonable diligence would have led to the discovery of the "new information" prior to the Motion for New Trial or the Sentencing hearing[;] therefore[,] the information is not newly discovered evidence.

This Court goes further, even though perhaps not necessary, and finds that the evidence would have been cumulative to all of the other evidence that

28

was part of the trial relative to the victim's credibility and it serves no other purpose.

Examination of witness #1 [Elizabeth Maxwell Rogers] during the Writ hearing proves that while the examiner or Psychiatric Nurse Practitioner signed off on the problem of depression, delusions and post traumatic stress disorder (Exhibit #1), she no longer agrees with such a conclusion. This Court also finds that many of the fantastic or "delusional" claims of the victim were shown to be true through examination and cross examination of the witness [the victim]. (Exhibit #6) Therefore, the Court does not find exhibit #1 to be credible evidence.

A writ of error coram nobis is available to a defendant in a criminal prosecution. T.C.A. § 40-26-105(a) (2006). The decision to grant or to deny a petition for the writ of error coram nobis on its merits rests within the sound discretion of the trial court. *State v. Ricky Harris*, 301 S.W.3d 141, 144 (Tenn. 2010) (citing *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007)). Tennessee Code Annotated section 40-26-105(b) provides, in pertinent part:

The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or, in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999); *State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). As previously noted by our Court, "the purpose of this remedy 'is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment.'" *State v. Hart*, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995) (quoting *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1996)).

To establish that he is entitled to a new trial, the Defendant must show: (a) the grounds and the nature of the newly discovered evidence, (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial, © that the Petitioner was without fault in failing to present

the newly discovered evidence at the appropriate time, and (d) the relief sought. *Hart*, 911 S.W.2d at 374-75. Affidavits should be filed in support of the petition. *Id*. at 375.

> The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories, as are the grounds for reopening a post-conviction petition. Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time. Coram nobis claims therefore are singularly fact-intensive. Unlike motions to reopen, coram nobis claims are not easily resolved on the face of the petition and often require a hearing.

*Harris v. State*, 102 S.W.3d 587, 592-93 (Tenn. 2003).

The record reflects that the coram nobis court did not abuse its discretion in denying the petition. As stated in Tennessee Code Annotated 40-26-105(b), [t]he relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, . . . ." The coram nobis court specifically found that the victim's compensation application, psychological reports, and diagnosis could have been discovered by the Defendant through the exercise of "reasonable diligence" prior to the hearing on the motion for new trial. Further, the coram nobis court properly evaluated the evidence presented at the coram nobis hearing, finding that the witness, Rogers, testified that, although she originally concluded that the victim suffered from depression, delusions, and post-traumatic stress, she no longer believed that the victim had delusions. Rogers testified that she would "question" that conclusion in this case. Therefore, because Rogers no longer agreed with the conclusion that the victim suffered from delusions, the coram nobis court found "Exhibit #1," the medical records, not to be credible evidence.

We agree with the coram nobis court that, had the Defendant exercised "reasonable diligence," the Defendant could have properly discovered the victim's medical records prior to the motion for new trial and properly argued that matter at the hearing. The information in the medical records was on file with the Tennessee Division of Claims Administration on January 6, 2010. The Defendant's sentencing hearing was on February 26, 2010, and the hearing on his motion for new trial was on February 4, 2011. Both of those hearing dates occurred after the information was on file with the state agency, giving the Defendant ample opportunity to litigate the contents of the victim's medical records at the hearing on the motion for new trial. Therefore, we conclude that the Defendant has failed to show that the coram nobis court abused its discretion in denying the petition for a writ of error coram nobis. The Defendant is not entitled to relief as to this issue.

## III. Conclusion

We conclude that any errors, considered together, did not result in prejudice to the judicial process and did not affect the substantial rights of the Defendant. Tenn. R. App. P. 36(b) ("A final judgment . . . shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not . . . would result in prejudice to the judicial process. . . . an appellate court may consider an error that has affected the substantial rights of a party at any time . . . ."). In accordance with the aforementioned reasoning and authorities, on the Defendant's direct appeal, we affirm the judgments of the trial court. On the Defendant's petition for writ of error coram nobis, we conclude the Defendant is not entitled to relief, and we affirm the coram nobis court's judgment.


_____

ROBERT W. WEDEMEYER, JUDGE